UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| UNITED STATES OF AMERICA | : | Hon. Jose L. Linares |
|---|---|---|
| v. | : | Criminal No. 14- 458 - JLL |
| ANTHONY BLUMBERG and MICHAEL CRAIG MARSHALL | : | 18 U.S.C. §§ 1343, 1348, and 1349 |

# INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

## COUNT ONE
(Conspiracy To Commit Securities Fraud And Wire Fraud)

1. At all times relevant to this Indictment, unless otherwise specified:

    a. ConvergEx Group, LLC ("ConvergEx Group") was a company that owned several operating subsidiaries, including broker-dealers and related companies offering brokerage services to U.S. and foreign institutional clients.

    b. ConvergEx Global Markets Limited ("CGM Limited"), was a wholly owned subsidiary of ConvergEx Group and was incorporated and headquartered in Bermuda. CGM Limited was registered as a broker-dealer in Bermuda.

    c. G-Trade Services, LLC ("G-Trade"), was a U.S. broker-dealer based in New York, New York, and a wholly owned subsidiary of

ConvergEx Group.

  d. ConvergEx Ltd. ("ConvergEx Ltd."), was a U.K. broker-dealer based in London, U.K., and a wholly owned subsidiary of ConvergEx Group.

  e. ConvergEx Asia Pacific Limited ("CAPL"), was a Hong Kong broker-dealer, and a wholly owned subsidiary of ConvergEx Group.

  f. G-Trade, ConvergEx Ltd., CGM Limited, and CAPL (and, in certain instances their predecessor entities) offered global portfolio and block trading services to clients through the ConvergEx Global Markets Division ("CGM Division"), which was formerly known as G-Port.

  g. ConvergEx Execution Solutions LLC ("CES") was a U.S. broker-dealer based in New York, New York and a wholly owned subsidiary of ConvergEx Group. CES offered transition management services to clients through the Global Transition Management Division ("GTM Division"). The GTM Division used the CGM Division to execute certain trades.

  h. From in or about 2006 through in or about August 2011, defendant ANTHONY BLUMBERG was the Chief Executive Officer of CGM Limited, head of the CGM Division, and an Executive Managing Director of ConvergEx Group.

  i. Defendant MICHAEL CRAIG MARSHALL was a Trader at CGM Limited and its predecessor entities and was part of the CGM Division. From in or about January 2008 through December 2011, defendant MARSHALL was a Senior Vice President of CGM Limited.

j.  Jonathan Daspin was employed as the Head Trader at CGM Limited and was part of the CGM Division.

k.  Thomas Lekargeren was employed as a Sales Trader at G-Trade and was part of the CGM Division.

l.  Clients placed orders to buy or sell securities with CGM Division Sales Traders by various means, including by telephone and e-mail. Clients agreed to pay G-Trade or ConvergEx Ltd.—the client-facing brokers—a commission for these services.

m.  Upon receiving orders to buy or sell securities from clients, CGM Division Sales Traders at G-Trade or ConvergEx Ltd. routed such orders to CGM Limited by entering the information related to the orders into an order management system called G-Pro. Beginning at least by in or about March 2010, the G-Pro order management system passed data through (and stored data on) a server located in Carlstadt, New Jersey, located in the District of New Jersey.

n.  Traders at CGM Limited, including defendant MARSHALL, executed an order to buy or sell a security for a client by routing the order to a local broker in the local market where the security was traded.

o.  After a local broker executed a trade, the local broker provided the Traders at CGM Limited with trade execution details, including the times, prices, and number of shares of each security bought and sold.

p.  Traders at CGM Limited, including defendant MARSHALL, used G-Pro to record the information related to the execution of a client's

order, including the prices that CGM Limited obtained from the local broker that executed the trade.

q.  Traders at CGM Limited regularly added a mark-up (an additional amount paid for the purchase of a security) or mark-down (a reduction of the amount received for the sale of a security) to the prices obtained from the local brokers, and recorded the price inclusive of any mark-up or mark-down in G-Pro in a column labeled "Client Price." Employees of ConvergEx Group, G-Trade, ConvergEx Ltd., CGM Limited, CAPL, and CES referred to mark-ups and mark-downs as "spread," "trading profits," or "TP."

r.  After Traders at CGM Limited completed a client's order, the broker who received the order from the client—generally G-Trade or ConvergEx Ltd.—provided a trade confirmation ("confirm") to the client.

s.  The price per share on the confirm included any mark-up or mark-down taken by CGM Limited, without breaking out separately the amount of such mark-up or mark-down.  The confirm separately listed the commission charged by the client-facing broker.  The confirms also generally included a disclosure that orders might be directed to affiliates for execution and that such affiliates might act as principal and in that connection earn a mark-up, mark-down, or spread.

t.  In addition, beginning by at least in or about 2004, employees of CGM Division (and its predecessor) provided a document to many clients—which generally contained the heading "Client Brokerage

Terms and Conditions"—that set out the terms and conditions under which orders would be accepted or transactions would be effected at the client's direction or on the client's behalf. Some of the provisions contained in this document changed over time. This document was generally between eight and ten pages long.

  u. Among the provisions included in these terms and conditions agreements was a provision within the "General Agreements" section containing language similar to the following:

> [U]nless otherwise agreed in writing, Client authorizes ConvergEx, in its sole discretion and without notice, to use the services of one or more other persons or entities (including its affiliates) in connection with the execution, clearance and/or settlement of any Order and/or Transaction, or otherwise to service Client or perform its obligations, and that such persons or entities may act as principal and earn a spread and may receive payment for order flow or other remuneration and share it with ConvergEx.

  v. As relevant here, a time and sales report was a report that summarized each of the individual transactions, sometimes called "fills" or "prints," that were entered into to execute an order. For each fill, an accurate time and sales report should have identified the number of shares involved in the trade, the time at which the trade was executed on the local exchange, and the price at which the shares involved in the trade were either bought or sold on the local exchange. A time and sales report may have also included the total price paid for purchase orders, and the total price received for sales orders. If such totals were not provided, a client could calculate the

totals with the information provided.

w. Providing a client an accurate time and sales report for a trade on which CGM Limited had taken spread would have risked revealing to the client the existence of spread because the total price from the time and sales report would have only included the cost of the securities purchased or sold exclusive of any spread, and thus the total price would have been different from the total price reported on the client's confirm, which did include spread.

x. Real-time fill data should have provided the client with an immediate data feed of the details of the trades that CGM Limited received from a local broker in the local market, including the times, prices, and number of shares bought or sold on the exchange.

y. In November 2010, after CAPL was formed in Hong Kong, certain orders were routed to CAPL. Traders at CAPL executed trades and regularly added on TP, but the trades and TP were ultimately booked by CGM Limited.

## The Conspiracy

2. From at least in or about 1997 through at least in or about August 2011, in Bergen County, in the District of New Jersey, and elsewhere, defendants

ANTHONY BLUMBERG
and
MICHAEL CRAIG MARSHALL,

along with co-conspirators Jonathan Daspin, Thomas Lekargeren, and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree with each other: (1) to devise and intend to devise a scheme and artifice to defraud clients, and to obtain money and property from clients, by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted writings, signs, signals, pictures, and sounds by means of wire, radio, and television communications in interstate and foreign commerce, contrary to Title 18, United States Code, Section 1343; and (2) to knowingly execute and attempt to execute a scheme and artifice to defraud clients, and to obtain money and property from clients, by means of false and fraudulent pretenses, representations, and promises in connection with the purchase and sale of any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act, contrary to Title 18, United States Code, Section 1348.

### Object of the Conspiracy

3.  The object of the conspiracy was for defendants BLUMBERG and MARSHALL, along with co-conspirators Daspin, Lekargeren, and others known and unknown to the Grand Jury, to hide from clients CGM Limited's practice of taking spread income by, among other things, deceiving, misleading, and making materially false statements to such clients when they requested information that could lead to the discovery that spread was

being taken, in order to earn substantial spread income from those clients.

## Manner and Means of the Conspiracy

4.  It was a part of the conspiracy that the conspirators would make affirmative misrepresentations to hide from clients the fact that spread was being or had been taken.

5.  It was further part of the conspiracy that when a client would request a time and sales report for a trade that had included spread, conspirators would create a false time and sales report containing data from other trades on the exchange that were not the client's trades to create a report that reflected the same total price and number of shares that appeared on the confirm for the trade. The conspirators would send such false report to the client in order to deceive the client and hide the fact that spread taken by CGM Limited had been included in the price.

6.  It was further part of the conspiracy that conspirators would willfully violate instructions from a client to provide real-time fill information in order to hide the fact that spread was being included in the prices provided to the client, and would make false statements to the client when the client would inquire about why real-time fill information was not being provided.

7.  It was further part of the conspiracy that G-Trade or ConvergEx Ltd. would receive orders for the purchase or sale of securities from clients to whom a false time and sales report had been provided, or to whom affirmative misrepresentations had been made, and would transmit such

orders to CGM Limited by entering the orders into G-Pro.

8.  It was further part of the conspiracy that after a false time and sales report had been provided or an affirmative misrepresentation made to a client, defendant MARSHALL and other Traders at CGM Limited and CAPL would execute orders received from G-Trade and ConvergEx Ltd. for such clients and record in G-Pro the amount of any spread.

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVEN
(Wire Fraud)

9. The allegations set forth in paragraphs 1, and 3 through 8 of Count One are repeated as though set forth herein.

10. On or about the dates set forth below, in Bergen, Essex, and Hudson Counties, in the District of New Jersey, and elsewhere, defendants

ANTHONY BLUMBERG
and
MICHAEL CRAIG MARSHALL,

and others known and unknown to the Grand Jury, did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud clients, and to obtain money and property from clients by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute this scheme and artifice, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures and sounds, as described below, each constituting a separate count of this Indictment:

| Count | Date | Description | Defendant(s) Charged |
|---|---|---|---|
| 2 | August 11, 2009 | A phone call regarding a client's request for a time and sales report while the participants were in New Jersey and Bermuda. | BLUMBERG |
| 3 | August 16, 2010 | A transmission from Bermuda to the G-Pro Server in Carlstadt, New Jersey recording a mark-up of approximately $2,581.95 on the purchase of Kingfisher plc stock (ticker symbol KGF) on behalf of a client. | BLUMBERG, MARSHALL |

| Count | Date | Description | Defendant(s) Charged |
|---|---|---|---|
| 4 | January 7, 2011 | A transmission from the G-Pro Server in Carlstadt, New Jersey to India resulting from downloading the time and sales reports for the purchase of 65,000 shares of Takeda Pharmaceutical Co. Ltd. stock (ticker 4502) and 80,000 shares of Astellas Pharma Inc. stock (ticker 4503) on behalf of a client. | BLUMBERG |
| 5 | April 5, 2011 | A transmission from Bermuda to the G-Pro Server in Carlstadt, New Jersey recording a mark-down of approximately $1,751.79 on the sale of JS Group Corp. stock (ticker symbol 5938) on behalf of a client. | BLUMBERG |
| 6 | June 13, 2011 | A transmission from Bermuda to the G-Pro Server in Carlstadt, New Jersey recording a mark-down of approximately $370.14 on the sale of Tatneft ADR securities (ticker symbol ATAD) on behalf of a client. | BLUMBERG |
| 7 | July 26, 2011 | A transmission from Bermuda to the G-Pro Server in Carlstadt, New Jersey recording a mark-up of approximately $9,278.33 on the purchase of Goldcorp Inc. stock (ticker symbol G) on behalf of a client. | BLUMBERG |

In violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

## COUNT EIGHT
(Securities Fraud)

11. The allegations set forth in paragraphs 1, and 3 through 8 of Count One are repeated as though set forth herein.

12. On or about August 11, 2009, in Essex and Hudson Counties, in the District of New Jersey, and elsewhere, defendant

ANTHONY BLUMBERG

and others known and unknown to the Grand Jury, did knowingly execute and attempt to execute a scheme and artifice to defraud clients, and to obtain money and property from clients by means of false and fraudulent pretenses, representations, and promises, in connection with any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934, by causing false time and sales reports to be provided to a client regarding the execution on or about August 7, 2009, of client orders to purchase a total of 389,256 shares of New York Community Bancorp, Inc. stock (ticker symbol NYB), which was publicly traded on the New York Stock Exchange.

In violation of Title 18, United States Code, Section 1348 and Title 18, United States Code, Section 2.

A TRUE BILL

_____
FOREPERSON

_____
JEFFREY H. KNOX
Chief, Fraud Section

_____
PAUL J. FISHMAN
United States Attorney

CASE NUMBER: 14-cr-458-JLL

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

ANTHONY BLUMBERG, and
MICHAEL CRAIG MARSHALL

# INDICTMENT FOR

18 U.S.C. §§ 1343, 1348, and 1349

A True Bill

Foreperson

**PAUL J. FISHMAN**
*U.S. ATTORNEY NEWARK, NEW JERSEY*

JUSTIN GOODYEAR, Trial Attorney
JASON LINDER, Trial Attorney
PATRICK M. PERICAK, Trial Attorney
(202) 307-5797

LESLIE FAYE SCHWARTZ
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 645-3986